**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

SIDNEY MCLENDON                                                                                              PLAINTIFF

v.                                                 No. 4:15CV00752 JLH

SCHLUMBERGER TECHNOLOGY
CORPORATION                                                                                                DEFENDANT

**OPINION AND ORDER**

Sidney McLendon brings this action against his former employer, Schlumberger Technology Corporation, for failure to pay overtime wages in violation of the Fair Labor Standards Act, 29 U.S.C. §§ 201-219. Schlumberger moves for summary judgment, arguing that it was not required to pay McLendon overtime wages because he was a highly-compensated employee under the FLSA. Because there are genuine disputes of fact as to whether the highly-compensated employee exemption applies, the motion for summary judgment is denied.

**I.**

Schlumberger is an oilfield services company. It operates in locations throughout the United States, but McLendon primarily worked out of the Conway, Arkansas location. He became a Tubing Conveyed Perforating Specialist ("TCP" specialist) in February 2011. Perforating creates holes in the casing—sometimes made from concrete—of an oil or natural gas wellbore. These holes create a connection between the wellbore and the reservoir, which is a part of the production process. A perforating gun, which contains explosive charges, is used to create the holes. A drill pipe is used to send the gun down into the wellbore and the charges are detonated according to where holes are required.

Schlumberger and McLendon give different descriptions of McLendon's duties and responsibilities as a TCP specialist. Schlumberger says that McLendon was responsible for consulting with the client to determine what equipment was most suitable and that he had the discretion to implement that determination and make changes to it. According to Schlumberger, McLendon was responsible for the overall safety of the operation. He supervised a crew, enforced safety rules, and led safety meetings.

Conversely, McLendon says he did not consult with the client or make decisions about what the job would require. Neither did he supervise the crew or lead safety meetings. McLendon says that a TCP Specialist elsewhere may have those responsibilities but that he worked with smaller-scale operations in Arkansas and was never required to supervise a crew. Instead, he was merely responsible for the equipment he transported from the shop. He built perforating guns in the shop, loaded the guns into his truck, transported the guns to the site, assembled the guns by attaching the firing heads, and then watched from his truck as the guns were run down into the well. Once the guns were in place, McLendon made sure the charges detonated. Then, after the guns were brought back up out of the well, McLendon disassembled and cleaned them.

McLendon's annual salary in 2011 was $53,000. By the time Schlumberger terminated McLendon's employment in 2015, his annual salary was $72,000. In addition to his salary, McLendon earned and received non-discretionary bonuses for each completed job. Schlumberger determined the amount of the bonus by a pre-determined percentage of the net amount of the client's payment. With the non-discretionary bonuses, McLendon's total income exceeded $100,000 in the years 2012, 2013, and 2014. McLendon's total income also would have exceeded $100,000 in the year 2015 had he not been terminated in November.

## II.

A court should grant summary judgment if the evidence demonstrates that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine dispute for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986). If the moving party meets that burden, the nonmoving party must come forward with specific facts that establish a genuine dispute of material fact. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986); *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). A genuine dispute of material fact exists only if the evidence is sufficient to allow a reasonable jury to return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). The Court must view the evidence in the light most favorable to the nonmoving party and must give that party the benefit of all reasonable inferences that can be drawn from the record. *Pedersen v. Bio-Med. Applications of Minn.*, 775 F.3d 1049, 1053 (8th Cir. 2015). If the nonmoving party fails to present evidence sufficient to establish an essential element of a claim on which that party bears the burden of proof, then the moving party is entitled to judgment as a matter of law. *Id.*

## III.

The FLSA requires covered employers to pay additional wages to non-exempt employees who work in excess of forty hours per week. 29 U.S.C. § 207. Schlumberger is a covered employer and admits that McLendon worked in excess of forty hours per week but did not receive additional wages for his overtime work. McLendon was therefore entitled to overtime pay unless an exemption

applied. 29 U.S.C. § 213. Schlumberger bears the burden to demonstrate its affirmative defense that McLendon was exempt from the FLSA's overtime requirements. *See Beauford v. ActionLink, LLC*, 781 F.3d 396, 401 (8th Cir. 2015). Schlumberger raises one affirmative defense in its motion for summary judgment: that McLendon was exempt as a "highly-compensated employee." Document #25-2 at 1; 29 C.F.R. § 541.601.

applied. 29 U.S.C. § 213. Schlumberger bears the burden to demonstrate its affirmative defense that McLendon was exempt from the FLSA's overtime requirements. *See Beauford v. ActionLink, LLC*, 781 F.3d 396, 401 (8th Cir. 2015). Schlumberger raises one affirmative defense in its motion for summary judgment: that McLendon was exempt as a "highly-compensated employee." Document #25-2 at 1; 29 C.F.R. § 541.601.

The highly-compensated employee exemption provides that an employee with a total annual compensation of at least $100,000[1] is exempt from the FLSA's overtime requirements if the employee customarily and regularly performs any one or more of the duties or responsibilities of an executive, administrative or professional employee. 29 C.F.R. § 541.601(a). McLendon does not dispute that he received a total annual compensation of at least $100,000. But the exemption does not apply if an employee's primary duty is manual labor, even if the employee customarily and regularly performs the duties or responsibilities of an executive, administrative, or professional employee. *Id.* § 541.601(d). Before determining whether McLendon performs any duties that exempt him under section 541.601(a), the Court must determine whether the exemption applies in the first place. The amount of time McLendon spent performing certain job duties and responsibilities, the importance of those duties and responsibilities, credibility determinations, and the weighing of the evidence are all fact questions for a jury. *Grage v. No. States Power Co. Minn.*, 813 F.3d 1051, 1054 (8th Cir. 2015) (collecting cases). Nonetheless, whether an employee's particular activities exempt him from the FLSA overtime requirements is a question of law. *Id.*

An employee's primary duty is "the principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a). Manual labor is work involving physical skill and

---

[1] The amount changed on December 1, 2016. 29 C.F.R. § 541.601(b).

energy and repetitive operations with the hands. *Id*. 541.3(a). The skills and knowledge required for the performance of manual labor are acquired through apprenticeships and on-the-job training, rather than a prolonged course of study like one a lawyer or doctor would complete. *Id*. Specific examples of those who primarily perform manual labor are carpenters, electricians, mechanics, plumbers, iron workers, operating engineers, longshoremen, and construction workers. *Id*. These workers are not exempt under the FLSA "no matter how highly paid they might be." *Id*.

A federal court sitting in Texas recently pointed out that workers in the oil and gas industry are difficult to classify because neither Congress nor the Fifth Circuit has determined whether oil field workers are manual laborers. *Galvin v. FTS Int'l Servs., LLC*, 7:16CV147-LG-DC, 2017 WL 3012651 at *3 (W.D. Texas June 7, 2017) (collecting cases). Neither has the Eighth Circuit. Whether an oilfield worker's primary duty is manual labor must be determined based on the facts in each case. *See Grage*, 813 F.3d at 1055. The following factors are relevant to determining an employee's primary duty: "relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed." *Id*. (quoting 29 C.F.R. § 541.700(a)). Furthermore, manual labor may be considered exempt if it is performed incidentally to non-manual labor. "Work that is 'directly and closely related' to the performance of exempt work is also considered exempt work." 29 C.F.R. § 541.703(a). "The phrase 'directly and closely related' means tasks that are related to exempt duties and that contribute to or facilitate performance of exempt work." *Id*.

Schlumberger mainly relies on the deposition and affidavit of its human resources manager, Preston Fraser Ziola, the TCP Specialist job description, and the TCP field operations manual to show that there is no dispute that McLendon's primary duty was non-manual work. Documents #25-3, #25-4, and #25-5. Ziola stated in his affidavit:

> 5. As a TCP Specialist in the Conway area, Plaintiff's primary duties involved supervision over the operations of using the drill pipe (sometimes referred to as the "drill string") to convey the perforating guns to the required depth in the wells . . . Plaintiff also supervised the use of mechanical firing heads, which were activated by hydraulic pressure applied to the well once the drill string was at total depth.
>
> * * *
>
> 7. The TCP Field Operations Manual outlines the importance of the TCP Specialist role in supervising and controlling the overall TCP operation and ensuring its safety.

Document #25-4 at 2. Ziola said in his deposition that once McLendon arrived at the job site with the perforating guns, he turned the guns over to the rig crew and the rig crew did the manual work required for rigging up. Document #25-5 at 13. Ziola explained: "His job—his essential task at the rig site is—is overseeing the operation and ensuring that the—the safety of the regular crew, communicating with the company man to make sure that the operation is being execute[d] properly." *Id*. The TCP Specialist job description uses words like "plans," "supervises," "directs," "manages," "administers," and "leads." Document #25-5. The description includes only one responsibility that can be characterized as manual labor, which is making required repairs. *Id*. It also provides that leadership is a required skill if the position has subordinates. *Id*. The TCP field operations manual reiterates the importance of safety and the responsibility of the "Schlumberger engineer/technician" to advise the customer regarding safety and to supervise the perforation process. Document #25-4

at 7. Schlumberger also provided the job description of a Gun Builder, which Ziola says the company employs to do the manual labor McLendon claims he does. *Id.* at 4-5.

McLendon says that Ziola, the TCP Specialist job description, and the TCP field operations manual do not accurately describe the duties he actually performed. *See* Document #29. According to McLendon, Schlumberger cannot show "plainly and unmistakably" that he fits within the highly-compensated employee exemption by relying exclusively on a written job description, manual, and the testimony of a human resources manager who never observed McLendon at work. *See Spinden v. GS Roofing Prods. Co., Inc.*, 94 F.3d 421, 426 (8th Cir. 1996) (stating that the burden is on the employer to prove that the employee fits plainly and unmistakably within the exemption's terms and spirit).

McLendon testified that his job duties and responsibilities did not include discussing plans with clients, advising clients about how to proceed, planning the equipment required, directing the selection and preparation of equipment, managing site operations, supervising a field operator crew, calling and leading safety meetings, and maintaining communication with clients to promote Schlumberger's services. Document #29-1 at 4-11. McLendon explained that the responsibilities and duties listed in the TCP specialist job description do not reflect what a TCP specialist does in Arkansas. *Id.* at 3. He said that TCP specialists overseas and offshore are more involved in the decision-making process. *Id.* at 3, 34.[2] In Arkansas, TCP specialists generally do the same thing everyday "with no variation in anything other than the number of charges [they] put in the gun." *Id.* McLendon did not select the equipment or tools to be used, but he prepared them, loaded them into

---

[2] McLendon worked offshore for Schlumberger for two years from 1995 through 1997. Document #29-1 at 35.

his truck, and unloaded them. *Id*. McLendon did not organize or lead the safety meetings, but he did participate in the meetings and completed a job safety analysis form for every job. *Id*. at 3, 33. The duration of the meetings depended on the client and ranged from five to thirty minutes. *Id*. at 33. The job safety analysis required McLendon to document certain hazards, like a potential lightning storm. *Id*.

McLendon's duties began in the workshop. *Id*. at 12. Once he received the well procedure via e-mail from the company engineer, he built the guns. *Id*. at 12, 30-33, 37. McLendon explained that he always used the same type of equipment and firing system, but could not start building the guns until the company engineer told him the depth of the well and how the guns were to be loaded. *Id*. at 30. He had no discretion. *Id*. at 37. He eventually loaded the heavy three-foot long guns and the four-and-a-half-foot long firing heads onto the truck along with two thirty-six-inch pipe wrenches, which took about thirty minutes. *Id*. at 30. It was McLendon's responsibility to deliver the guns to the well site in a timely manner. *Id*. at 27. When McLendon arrived on site, he found the well site supervisor and compared the documents each received stating the well procedure, to ensure they both received the same instructions. *Id*. at 14. Once the well procedure was confirmed, he fastened the firing heads to the perforating guns. *Id*. at 10. Then, he fastened the guns to the tubing. *Id*. at 11.

After that, McLendon returned to his truck and watched as the rig crew "torqued up" the fastenings and sent the guns down into the well. *Id*. This process, his part and the rig crew's part, usually took around an hour. *Id*. at 22. McLendon testified that he was responsible for the equipment he brought. *Id*. at 18. He did not shoot the guns, but ensured that they did shoot. *Id*. at 21-22. To ensure the guns discharged, McLendon says he stood there "holding on to the pipe to see

if [he] fe[lt] it go bang, bang, bang." *Id*. at 22. Then, after the guns were brought back up out of the well, McLendon disassembled and cleaned them. *Id*. at 19. McLendon testified that his interactions with the client were limited. *Id*. at 37. Apart from ensuring that they each had the same well procedure, McLendon said: "They tell me what they want for lunch." *Id*.

As stated above, Schlumberger and McLendon describe his primary duties as a TCP Specialist differently. An employee's job description, the job description of a lower paying job with some overlapping duties, and a representative of the employer's reiteration of that description without first-hand knowledge, are insufficient to establish the exempt status of an employee. Rather, "[t]he exempt or nonexempt status of any particular employee must be determined on the basis of whether the employee's salary and duties meet the requirements of the regulations . . . ." 29 C.F.R. § 541.2. Here, there is a genuine dispute as to what duties McLendon actually performed on a daily basis. Schlumberger says one thing and McLendon says another. Absent more convincing evidence in favor of Schlumberger, the jury is entitled to determine who they believe. *See Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inference from the facts should be left to the jury") (internal quotation omitted), *cf.*, *Pruneda v. Xtreme Drilling & Coil Servs., Inc.*, 5:16CV091-DAE, 2017 WL 3023214 (W.D. Tex. June 20, 2017) (holding in oilfield case where employee and employer described duties similarly but emphasized different duties that employer had presented sufficient evidence to establish that primary duty was managerial work). Specifically, the jury needs to weigh the evidence and determine the duties McLendon performed as a TCP Specialist before the Court can decide the legal question of whether the highly-compensated employee exemption applies. *See Grage*, 813 F.3d at 1056. A reasonable juror could find in favor of McLendon based on the evidence

in the record. Therefore, Schlumberger has failed to meet its burden and summary judgment is improper.

## CONCLUSION

For the foregoing reasons, Schlumberger's motion for summary judgment is DENIED. Document #25.

IT IS SO ORDERED this 31st day of August, 2017.

_____
J. LEON HOLMES
UNITED STATES DISTRICT JUDGE